**CITY OF UNIVERSITY PARK,**
**Texas, Appellant,**

v.

**Thomas L. VAN DOREN, Appellee.**

No. 05–98–00887–CV.

Court of Appeals of Texas,
Dallas.

Nov. 27, 2001.

Rehearing Overruled Jan. 24, 2002.

Robert E. Hager, Nichols Jackson Dillard, Hager & Smith, LLP, Dallas, for Appellant.

Thomas L. Case, Thomas L. Case & Associates, P.C., Dallas, for Appellee.

Before Justices LAGARDE, MOSELEY, and FITZGERALD.

## OPINION

KERRY P. FITZGERALD, Justice.

The City of University Park appeals the judgment rendered against it in favor of Thomas L. Van Doren following a jury trial in this workers' compensation discrimination case. The City brings issues asserting: (a) the evidence is legally insufficient to support the verdict; (b) Van Doren is judicially estopped from recovering for damages suffered after March 31, 1995; and (c) Van Doren cannot recover mental anguish damages. Van Doren brings one cross-issue asserting the trial court erred in refusing to order he be reinstated to his previous position. We resolve the City's issues against it and Van Doren's cross-issue in his favor.

## FACTUAL BACKGROUND

Van Doren began working for the City's police department in 1984 in the rank of lieutenant. He was soon promoted to captain overseeing the patrol and administrative lieutenants, Leon Holman and Michael Brock. When the police and fire chief retired, Van Doren became the acting police and fire chief until the City hired the current police and fire chief, Robert Dixon. In about 1988, the City changed the titles, but not the duties, of Van Doren's, Holman's and Brock's positions: Van Doren became the assistant police chief, and Holman and Brock became captains. In 1991, Bob Livingston became the city manager, and he concluded the City had too many administrative employees. Within about six months after his arrival, Livingston determined that the assistant director of each department—the assistant police chief, assistant fire chief, assistant city manager, assistant finance director, and operations manager—were unnecessary positions and that the City should eliminate the positions through attrition.

Van Doren's position of assistant police chief was largely administrative, but he went on patrol occasionally to improve officer morale, to have greater contact with the officers, and to allow patrol supervisors to have some time off. In 1991, while on patrol, Van Doren injured his ankle getting out of a patrol car to subdue a robbery suspect. His condition was initially diagnosed as a sprain, but it did not improve beyond a certain point. Van Doren's injured ankle began to turn out, and this condition grew worse over time. He also suffered swelling and soreness in his ankle. In 1993, the injury was diagnosed as a torn and atrophied ligament. Van Doren's physician recommended a surgery requiring Van Doren to put no weight on the ankle for eight weeks following the surgery. Van Doren filed a workers' compensation claim. Luanne Best Hanford, the City's human resources director, notified the City's workers' compensation insurance carrier that Van Doren's claim was "suspect," and the carrier initially denied Van Doren's claim. After further investigating Van Doren's claim, the carrier concluded that the claim was covered, and it agreed to pay Van Doren workers' compensation benefits.

The City had a policy of providing salary continuation benefits, which is payment of the difference between the workers' compensation benefits and the employee's regular salary, for sixty days following an on-the-job injury. Van Doren requested that he be paid the salary continuation benefits during the first sixty days he would be off work following his surgery. Livingston initially denied Van Doren's request for salary continuation benefits because the City's policy stated the benefits would be paid for the first sixty days following the injury, and two years had passed since Van Doren's injury. However, Van Doren provided evidence that the City had paid another employee salary continuation ben-

efits after the first sixty days. Van Doren also told Livingston that he could not afford the reduction in his pay and, because his duties were largely administrative, he could adequately perform his job from a wheelchair with his leg elevated, provided the City had complied with the Americans with Disabilities Act and had made its offices wheelchair accessible. Rather than make a wheelchair accommodation, Livingston agreed that Van Doren could receive salary continuation benefits.

During these disputes with the City over workers' compensation and salary continuation benefits, Van Doren continued to work, and the condition of his ankle worsened. He finally underwent surgery in September 1993. The operation required fusing his ankle and placing screws in the bones. Van Doren's ankle did not heal properly. In late February 1994, Van Doren told Hanford he feared his ankle problem would be permanent and that he might not be able to return to work "on full duty status." Van Doren ultimately underwent a second surgery in February 1994 to remove the screws. In March 1994, shortly after his second surgery, Van Doren wrote Hanford a letter asking her to prepare a retirement, disability, and severance package for him.

During the months Van Doren was away from the office undergoing and recovering from surgery, Holman and Brock took over Van Doren's duties. In late 1993 or early 1994, Livingston discussed with Hanford and Dixon the possibility of eliminating Van Doren's position. When Hanford informed Livingston of Van Doren's possible retirement, Livingston asked Dixon to determine whether the police department could operate without the assistant police chief position. In response to Livingston's request, Dixon asked Holman and Brock if performing Van Doren's duties appreciably increased their workload, and they report-

ed to Dixon that performing Van Doren's duties did not appreciably increase their workload. Dixon had stressed in a performance review from May 1991 that Van Doren's position was "very critical." Nevertheless, in March 1994, Dixon reported to Livingston that the assistant police chief position could be eliminated.

Meanwhile, Van Doren's ankle improved following the second surgery. Van Doren rejected the severance and retirement packages Hanford and Livingston offered him, and he said he wanted to return to work. Van Doren testified that he "could do the assistant chief of police's duties." However, in May 1994, Dixon and Hanford notified Van Doren that his position would be eliminated in the next budget.

In the letter informing Van Doren of the elimination of his position, Hanford referenced the City's Policy for Implementation of a Reduction in Force, which concerned elimination of positions due to budgetary constraints during times of economic recession, and she attached a copy of that policy to the letter. However, at trial, Hanford admitted the policy was not applicable and the City did not follow its provisions.

Hanford also told Van Doren his resume would be kept on file and, for the next twelve months, he would be contacted to apply for any positions with the City for which he might be qualified. Although there were occasional police dispatcher and other vacancies, Hanford did not notify Van Doren about them. Hanford testified she considered Van Doren unqualified for the post of dispatcher because of his

high absentee rate and his lack of alertness. Van Doren, however, testified that he was qualified for a number of positions with the City, including dispatcher, that became vacant in the year following the elimination of his position, but he was never contacted by Hanford about them. Dixon testified that Van Doren's presence as a dispatcher in the police headquarters would be deleterious to officer morale. Van Doren stated he could perform the task of the administrative police captain, which was Holman's position at the time.[1] Van Doren asked Dixon to demote him back to captain, with the corresponding salary cut. Dixon could, in turn, demote Holman to lieutenant, and demote one of the lieutenants to an existing police officer opening. Dixon testified he refused to make this series of demotions because it would hurt officer morale. Van Doren unsuccessfully applied for numerous police chief positions in Texas and Arkansas. Van Doren finally found employment as an investigator, but at a reduced salary from his assistant police chief position with the City.

Livingston testified that he submitted a proposed budget to the city council in August 1994. A cover memorandum recommended to the city council that the assistant police chief position be eliminated because it was unnecessary, which would save the City $90,000 per year. On September 14, 1994, the City passed two ordinances implementing the proposed budget and amending the City Pay Plan,[2] which eliminated Van Doren's position beginning October 1, 1994.[3]

---

1. There was evidence that Van Doren's record on the force was superior to Holman's and Brock's records.

2. The City Pay Plan listed all of the employee positions with the City and their compensation. Ordinance No. 94/33 amending the City Pay Plan included the positions of assistant

fire chief, operations manager, and assistant city manager, but not assistant police chief.

3. The assistant finance director's position was also eliminated in the October 1994 budget. However, the position had been vacant since the assistant finance director's resignation in

Throughout the trial, considerable time was devoted to evidence of whether the assistant police chief position was purely administrative or whether the post required an ability to perform police patrol work, and the parties continue to disagree on this issue. Van Doren asserts that patrol is not part of the essential job function.[4] In October 1990, Dixon answered a "Job Analysis Questionnaire," which inquired, amongst many categories, about the special physical requirements of the assistant police chief position. Dixon answered this query as follows: "Employee must be in good physical condition so as to effect arrest and work long hours if needed. [M]ust have emotional makeup to cope effectively with job stress." In 1992, the City hired a consultant to write job descriptions for the City's positions to comply with the Americans with Disabilities Act. For the physical requirements of the assistant police chief position, the 1992 job description stated, "Ability to sit, stand and transport self from building to building. Ability to attend functions and meetings in buildings and at other sites. Must be able to use firearms." Van Doren stresses that job description—which was created by an independent expert—listed neither an ability to do patrol work nor any other specific physical requirement.[5]

In February 1995, Van Doren applied for disability benefits effective after March 31, 1995. Part one of the application contained a job description filled out by Hanford. Hanford did not follow the 1992 job description. Instead, Hanford used information from Dixon to describe the assis-

tant police chief position. Hanford listed on the application the frequency and duration of various physical activities "customarily required" for the position and stated that walking, standing, and sitting as being required "frequently" for a duration of "several hours." The application also asked for a list of "[o]ther required activities that would be applicable in determining whether the person is capable of or unable to perform the customary duties of this position," and the City listed these "other required activities" as follows: "Must be capable of performing law enforcement duties including patrol, apprehension & subduing of suspects, traffic control, etc." Part two of the application was filled out by Van Doren. Van Doren answered "Yes" to the query of whether "the information furnished by the City . . . correctly state[d] [his] job description, duties and activities." The application then stated, "If part one [the job description] does not contain information you believe to be correct, state any matters upon which you disagree." Van Doren answered, "90% administrative work, infrequent need to subdue suspects, although I was injured subduing a suspect." The application then asked, "Which of the duties and/or activities listed in part one [the job description] do you believe you cannot perform?" Van Doren answered, "Walking, standing frequently for several hours, subduing fleeing suspects."

Throughout his career with the City, Van Doren always received excellent performance reviews. He received praise and

---

October 1993. The assistant city manager's position was eliminated after he became the City's finance director. The operations manager's position was eliminated when he became the management systems coordinator. The assistant fire chief's position was eliminated after he retired.

4. Van Doren testified he wore plain clothes to work and did not own a police officer's uniform.

5. Hanford testified that the department heads were not satisfied with the consultant's job descriptions, but Hanford did not rewrite them.

commendations for his hard work under difficult circumstances. Although he was criticized for his occasional tardiness (Van Doren lived fifty miles from work), his evaluations noted that he frequently worked long hours to complete his work. Besides his problem with his ankle, Van Doren also suffered from Reiter's Syndrome, a condition similar to rheumatoid arthritis causing pain in the joints. Van Doren occasionally missed work due to Reiter's Syndrome. Van Doren was not criticized in his evaluations for his forty to ninety-six hours of sick leave he used because those absences were excused. His evaluations noted he sometimes was at work when he would have been justified in using sick leave. Despite these high evaluations, the "City Termination Form," filled out October 5, 1994 by Holman, described Van Doren's work as "Satisfactory."

Van Doren sued the City for eliminating his position in retaliation for his filing a workers' compensation claim and for his being disabled. Van Doren sought damages against the City as well as reinstatement to the position of assistant police chief. During the trial, Dixon testified he never discriminated against anyone in his departments for filing a workers' compensation claim. However, Van Doren testified that officers were discouraged from filing workers' compensation claims by receiving poor evaluations for attendance even though they were missing work due to an on-the-job injury. Dixon was praised in an evaluation for "hav[ing] made great strides in getting rid of several chronic accident victims or accident prone people." Van Doren also testified that the City's department heads were criticized because the employees in their departments had filed workers' compensation claims. On a list of personnel in Dixon's departments who had filed workers' compensation claims, Hanford wrote the following note: "Chief-no star for *you* this month! You might need to tell your folks to be careful out there & watch what they're doing."

A jury found that the City eliminated Van Doren's position in retaliation for his filing a workers' compensation claim in good faith, and it found that Van Doren's disability, if any, was not a motivating factor in the elimination of his position. The jury found Van Doren's lost earnings and benefits between October 1, 1994 and March 31, 1995 totaled $31,720, and his lost earnings and benefits between April 1, 1995 and the day of the jury's verdict was $217,098. The jury also found future lost earnings and benefits of $361,287 and past nonpecuniary losses, including mental anguish, of $150,000. The trial court rendered judgment for Van Doren against the City for $250,000, which is the maximum damages recovery authorized by the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.023 (Vernon 1997). The trial court denied Van Doren's request for reinstatement to the position of assistant police chief.

## SUFFICIENCY OF THE EVIDENCE

In its first issue, the City asserts "there is no substantial evidence, no credible evidence and against [sic] the great weight of the evidence that the city council, in eliminating the position of assistant chief of police, acted with any discriminatory animus." Although the wording of this issue makes it appear the City is asserting factual insufficiency of the evidence, the City's argument under this issue asserts only the legal insufficiency of the evidence. The City's argument does not include a standard of review. The City's prayer requests rendition in its favor but does not request a new trial. Accordingly, we conclude the City's first issue argues only the legal sufficiency of the evidence. *See Glo-*

ver v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401–02 (Tex.1981) (remand for new trial is remedy for factual insufficiency of evidence); *Beach v. Resolution Trust Corp.*, 821 S.W.2d 241, 245 (Tex.App.— Houston [1st Dist.] 1991, no writ) (rendition is remedy for no evidence).

 In addressing a legal sufficiency or no-evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, that support the jury's finding, and we must disregard all evidence and inferences to the contrary. *See Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *Alm v. Aluminum Co. of Am.*, 717 S.W.2d 588, 593 (Tex.1986). If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails. *See Stafford*, 726 S.W.2d at 16. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex.1970). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence. *See Kindred*, 650 S.W.2d at 63.

### Can the Courts Review the City Council's Actions?

The City grounds its fundamental arguments on the premise that its council may make decisions concerning administration of City staff without interference from the judicial branch of government. It cites the venerable case of *City of San Antonio v. Wallace*, 161 Tex. 41, 338 S.W.2d 153 (1960), for the proposition that when the council is exercising its legislative duties, its exercise of those duties is "beyond the pale of judicial scrutiny." [6] However, whether the City casts its arguments in the guise of separation of powers or legislative immunity, there are limits to the protection the City can claim for council actions.

 The City correctly speaks to the significant inherent power of a home rule city. Such a city derives its power not from the legislature but from the Texas Constitution. *See* TEX. CONST. art. XI, § 5 (granting power to make and amend charter so long as "no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State"). The legislature has recognized the inherent powers of home rule cities in Texas. *See* TEX. LOCAL GOV'T CODE ANN. § 51.072 (Vernon 1999).[7] These cities look to the

---

6. We strongly disapprove of the City's discussion of *Wallace*, which states only this general rule and ignores the supreme court's clear directive concerning review of a municipality's removal of legislatively protected civil service positions under a good faith standard. Contrary to the City's assertion, the supreme court did *not* hold that San Antonio's elimination of civil service positions could not be questioned. Instead, the supreme court agreed with authorities:

> support[ing] the proposition that an action of a city legislative body abolishing civil service positions may be judicially examined in the light of its surrounding circum-

stances, the prior and subsequent actions of such legislative body and the public policy represented by the civil service law in order to determine the good faith of the questioned action.

*Wallace*, 161 Tex. at 46, 338 S.W.2d at 156. Nevertheless, we conclude that *Wallace* does not govern this case. Van Doren was an at-will employee of the City, not a civil service worker. And the City's actions here are to be measured against its specific obligations under section 451.001 of the labor code, not some general standard of good faith.

7. That provision states:

acts of the legislature not for grants of power but only for limitations on their power. *See Proctor v. Andrews,* 972 S.W.2d 729, 732 (Tex.1998). Statutory limitations on a home rule city's powers may be express or implied, but an implied limitation must be "unmistakably clear." *See id.; see also Lower Colo. River Auth. v. City of San Marcos,* 523 S.W.2d 641, 643 (Tex.1975).

■ Accordingly, the first question before us is whether Van Doren's claim implicates an unmistakably clear statutory limitation on the City's home rule right to pass ordinances administering its budget and staff. We conclude that it does. Van Doren charges the City with violation of the statute known as the Anti Retaliation Law:

> A person may not discharge or in any other manner discriminate against an employee because the employee has:
>
> (1) filed a workers' compensation claim in good faith.

TEX. LAB.CODE ANN. § 451.001 (Vernon 1996). The City, in its role as employer, is bound by this provision. *See Kuhl v. City of Garland,* 910 S.W.2d 929, 931 (Tex.1995) (municipality's sovereign immunity is waived for claims under Anti Retaliation Law). Thus, the City would clearly be liable if it directly retaliated against Van Doren on account of his claim. But the City may not accomplish indirectly what it cannot do directly. Thus, the prohibition upon retaliation against an employee who has filed a good faith workers' compensation claim is an implied-but unmistakably clear-limitation imposed by the legislature on the City's power to eliminate a staff position. Despite the City's protestations,

we conclude the judiciary, at the trial and appellate levels, is empowered to review the City's actions in eliminating Van Doren's position to determine whether those actions violated the Anti Retaliation Law. Doing so does not constitute judicial interference with the City's constitutional powers, but rather the vindication of the legislature's constitutional authority to limit those powers.

### Did the City Violate the Anti– Retaliation Law?

■ Van Doren bore the burden at trial to establish the City discharged him because he had, in good faith, filed a workers' compensation claim. TEX. LAB.CODE ANN. § 451.002(c) (Vernon 1996) (burden of proof in section 451.001 proceeding is on employee). There is no question in this case that Van Doren filed a workers' compensation claim, and there is no question that his job was eliminated. The critical piece of Van Doren's burden lies in the issue of causation. To prevail on his retaliatory discharge claim, Van Doren must have established a causal connection or link between his compensation claim and his discharge.

■ A causal link may be proven by circumstantial evidence. *See Paragon Hotel Corp. v. Ramirez,* 783 S.W.2d 654, 658 (Tex.App.—El Paso 1989, writ denied). The supreme court has identified the appropriate standard of causation in this type of case: "the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did." *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996) (quoting the test from *Tex.*

(a) The municipality has full power of local self-government.
(b) The grant of powers to the municipality by this code does not prevent, by implication or otherwise, the municipality

from exercising the authority incident to local self-government.

TEX. LOCAL GOV'T CODE ANN. § 51.072 (Vernon 1999).

*Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex.1995)). In *Cazarez*, the supreme court also set forth the standard that had been applied below by the appeals court in that case to test for a causal link between a workers' compensation claim and an employee's discharge. The court of appeals asserted circumstantial evidence sufficient to establish a causal link can include:

- knowledge of the compensation claim by those making the decision on termination;

- expression of a negative attitude toward the employee's injured condition;

- failure to adhere to established company policies;

- discriminatory treatment in comparison to similarly situated employees; and

- evidence that the employer's stated reason for the discharge was false.

*See id.* at 451.[8]

The City argues that no direct or circumstantial evidence exists of these five factors. We disagree. The record contains evidence of a number of the *Cazarez* factors:

- The City had no established policy for the elimination of positions other than for budgetary constraints in times of economic recession, and the City did not follow that policy. *See Cazarez*, 937 S.W.2d at 451 ("failure to adhere to established company policies").

- There was evidence Van Doren received discriminatory treatment in comparison with at least one similarly situated employee: the City maintained the other assistant director positions until the employees in those positions voluntarily resigned, retired, or took other positions with the City. Van Doren's position was eliminated despite his professed desire to return to work when he recovered from surgery. *See id.* ("discriminatory treatment in comparison to similarly situated employees").

- The City's failure to notify Van Doren of positions with the City for which he was qualified is circumstantial evidence that the City's stated reason for the elimination of Van Doren's position was false. Van Doren testified there were several openings for which he was qualified but he was never notified of them by the City. Further, Livingston's testimony that the assistant director positions in the City would be eliminated through attrition and his recommending the elimination of Van Doren's position to the city council after Van Doren had notified the City he would be able to return to work also tends to show the City's stated reason for eliminating Van Doren's position

---

8. The supreme court did not expressly approve or disapprove the court of appeals' five-factor test. It noted that the court of appeals' opinion issued one week after its own opinion in *Hinds*. In reviewing the court of appeals' conclusions concerning causation, however, the supreme court stated that "[w]hether one uses the *Hinds* standard or the standard articulated by the court of appeals," there was some evidence of a retaliatory discharge. *Cazarez*, 937 S.W.2d at 451. More specifically, the supreme court concluded there was evidence under two factors (a negative attitude toward the injury in the form of disbelief the plaintiff had been to a doctor, and a false reason for discharge), which was sufficient to support a finding of retaliation.

The supreme court set out the five factors in another whistle-blower case. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000). However, it does not appear the court applied them in that case. In *Zimlich*, the court noted the employer's negative attitude toward the employee's report of illegal condition cannot, standing alone, support the requisite causal link. *See id.*

was false.[9] *See id.* ("evidence that the stated reason for the discharge was false").

Moreover, the evidence shows Dixon terminated accident-prone employees and downgraded employees missing work due to on-the-job injuries. From this evidence, a jury could have inferred Dixon customarily discriminated against employees filing workers' compensation claims. This evidence is even stronger evidence of a causal connection than evidence that Van Doren himself was treated differently.[10]

The City focuses almost exclusively on the first-listed factor. It argues no evidence supports the jury's decision because no evidence shows the city council had knowledge of Van Doren's workers' compensation claim when it passed the ordinances eliminating his position. The City's argument is premised on the assertion that it cannot be liable for discrimination unless the city council members had actual knowledge of Van Doren's workers' compensation claim. Again, we disagree.

In the first instance, the list of factors identified in *Cazarez* is merely illustrative: contrary to the City's assertion, we find no authority requiring evidence be presented on every factor in order to establish the requisite causal connection.[11] Employment cases are notoriously fact-specific. The type of evidence that will serve to create or to destroy a causal connection in any particular case will likely be unique to that case's facts.

---

**9.** After the lawyers for both sides finished questioning each witness, the judge asked the witness questions submitted by the jurors. One juror submitted the following question for the court to ask Livingston:

The Court: And if Mr. Van Doren had not been injured, would he still have his position?

[Livingston]: No. We were eliminating the position because—now, again, he came in and asked if he could go off on disability retirement. At that point, he asked the question, I went through the process of getting it answered. And the answer was we don't need the position. At that point, I felt like I ethically had to—I had asked the question, I had gotten an answer, My ethics required me to stay with it.

The lawyers and the trial court then discussed whether Livingston's answer was responsive to the juror's question. The trial court permitted the lawyers to ask Livingston the following questions to clarify the juror's question and to obtain a responsive answer:

[Van Doren's counsel]: The question—and, like I said, I'm just—if I'm wrong, I hope somebody corrects me. I'm trying to pose what I believe the jury was asking and that is if you never knew Mr. Van Doren was hurt, if this accident had never happened and he had kept on working, would he have been allowed just to retire through attrition like the city chief of police?

[Livingston]: Yes.

[The City's counsel]: My question is: If after his surgery he had come back to work and never approached the personnel director about not being able to come back to work, would his position still have not been eliminated unless he left voluntarily?

[Livingston]: Yes. We would have kept the position.

**10.** The City objected to evidence of other discriminatory acts on grounds of vagueness; the objection was overruled. The City has not assigned error in this Court to the admission of that evidence.

Van Doren cannot rely upon "legally justified conduct" by the City to illustrate negative attitudes or unfair treatment. *See Cazarez,* 937 S.W.2d at 451. However, the acts alleged by Van Doren would have violated the Anti Retaliation Law. Thus, they can be considered as circumstantial evidence in Van Doren's case.

**11.** Indeed, in *Cazarez,* the supreme court concluded that evidence on just two of the factors was sufficient to allow the district court to infer the termination in that case violated section 451.001. *See Cazarez,* 937 S.W.2d at 452 (pointing to evidence employer's explanation for termination was false and evidence company's employment manager had expressed doubt employee had gone to see a doctor).

Furthermore, the City's reading of this first *Cazarez* factor is too narrow, and evidence on this factor was admitted. The supreme court speaks to evidence that "those making the decision" concerning termination had knowledge of the plaintiff's claim. *Id.* at 451. Evidence at trial established the way the City reached the decision concerning Van Doren's position: its supervisors made recommendations to the council, and the council—without any independent investigation—adopted those recommendations. The true decision makers were the supervisors, and it is undisputed that Dixon, Hanford, and Livingston knew of Van Doren's workers' compensation claim. *See, e.g., Tex. Animal Health Comm'n v. Garza,* 27 S.W.3d 54, 60 (Tex. App.—San Antonio 2000, pet. denied) (first factor satisfied by direct supervisor's knowledge of employee's claim, when supervisor had expressed animosity to claims process).

Van Doren's burden was to establish that the elimination of his position would not have occurred when it did if he had not filed his workers' compensation claim. *See Cazarez,* 937 S.W.2d at 450. We conclude the record contains legally sufficient circumstantial evidence to support the jury's finding in his favor. We resolve the City's first issue against it.

## BACK–PAY

█ In its second issue, the City asserts that Van Doren "is judicially estopped from seeking damages past February 28, 1995 for the reason that he, by the doctrine of estoppel, was unable to perform the essential functions of his job and took disability retirement." [12] Estoppel is an affirmative defense and must be pleaded. *See* TEX.R. CIV. P. 94. The City did not plead estoppel. Accordingly, it may not assert estoppel on appeal. *See Trevino v. Houston Orthopedic Ctr.,* 831 S.W.2d 341, 344–45 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *CKB & Assocs. v. Moore McCormack Petroleum, Inc.,* 809 S.W.2d 577, 584 (Tex.App.—Dallas 1991, writ denied). We resolve the City's second issue against it.

## MENTAL ANGUISH DAMAGES

█ In its third and fourth issues, the City asserts that Van Doren is not entitled to damages for mental anguish. The judgment is not reversible unless the error probably caused the rendition of an improper verdict. *See* TEX.R.APP. P. 44.1(a)(1). Under the Texas Tort Claims Act, the City waived its immunity from liability only to a maximum of $250,000. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.023 (Vernon 1997). The damages found by the jury totaled $760,088. In accordance with the Texas Tort Claims Act, the trial court entered judgment for $250,000. The jury awarded Van Doren $150,000 for "[c]ompensatory damages in the past which may include emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." Even without those damages, Van Doren's damages total $610,088, more than double the maximum recovery allowed under the tort claims act. Because the trial court reduced the jury's damages award to Van Doren to $250,000, any error by the trial court in submitting mental anguish as a damages element is

---

12. Although its statement of the issue asserts "February 28, 1995" is the date after which Van Doren is estopped from recovering damages, the City's argument under this issue states that "[M]arch 30, 1995" and "March 31, 1995" are the dates from which estoppel barred further damages by Van Doren. Having reviewed the argument in its entirety, it appears the City means to argue that the date on which Van Doren began receiving long-term disability benefits, April 1, 1995, is the date from which he is estopped.

harmless. We resolve the City's third and fourth issues against it.

## REINSTATEMENT

■ In his cross-issue, Van Doren asserts the trial court erred in denying his request to be reinstated in his former position of employment with the City. Section 451.002(b) of the labor code provides, "An employee discharged in violation of Section 451.001 is entitled to reinstatement in the former position of employment." TEX. LAB. CODE ANN. § 451.002(b) (Vernon 1996). The statute is couched in mandatory language and contains no exceptions.

The City argues that the separation of powers doctrine prohibits the courts from dictating legislation to a legislative unit such as the city council. In this instance, the City avers, an order of reinstatement would be tantamount to ordering the council to create and fund a position that does not exist. The City asks this Court to ignore the jury's finding, supported by the evidence, that the reason the job and funding do *not* exist is because of the retaliatory recommendation by Van Doren's supervisors, which was implemented by the city council. To ignore that fact would encourage every employer intent on getting rid of a workers' compensation claimant to eliminate the claimant's job—in reality or on paper—so as to avoid any possibility of reinstatement. That we will not do.

Again, a home rule city's powers are limited by the Texas Legislature's clear dictates. Here, the City's power to administer its staff is limited by its section 451.001 obligation not to retaliate against an employee who has filed a good faith workers' compensation claim. The jury found the City eliminated Van Doren's position because he filed a workers' compensation claim in good faith, hired a lawyer to represent him in a workers' compensation claim, or instituted or caused to be instituted a workers' compensation proceeding in good faith, and we have concluded that legally sufficient evidence supports that finding. This constitutes retaliation against Van Doren in violation of section 451.001. Accordingly, Van Doren is entitled to the remedy of reinstatement. *See id.* We resolve Van Doren's cross-issue in his favor.

## CONCLUSION

We reverse the portion of the trial court's judgment denying Van Doren's request to be reinstated to his former position, and we render judgment awarding Van Doren reinstatement in his former position of employment. In all other respects, we affirm the trial court's judgment.