

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00323-CV

———————————————

IN THE INTEREST OF K.A., A CHILD

On Appeal from County Court at Law No. 1
Wichita County, Texas
Trial Court No. CCL1-CP2023-1039

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

**MEMORANDUM OPINION**

Appellant Mother appeals from a judgment terminating her parent–child relationship with her daughter, Keaton.[1] Mother challenges the legal and factual sufficiency[2] of the trial court's finding that termination was in Keaton's best interest. We affirm.

## I. Brief Background

Less than a month after Keaton's sixth birthday, she was removed from Mother's care. A year later, Mother's parent–child relationship with Keaton was terminated after a two-day trial[3] to the court.[4] Although Mother attended the first day of trial and testified, she did not appear for the second.

At the time of Keaton's removal, Mother and Keaton were living in Oklahoma but visiting Wichita Falls. Keaton was in the car with Mother when Mother was arrested after a traffic stop; police found a gun and a controlled substance in Mother's

---

[1]We use pseudonyms to protect the child's identity. *See* Tex. R. App. P. 9.8(b).

[2]Although Mother does not expressly mention that she is challenging both legal and factual sufficiency, she seeks not only a rendition but also, in the alternative, a remand. *See, e.g.*, *City of Univ. Park v. Van Doren*, 65 S.W.3d 240, 246 (Tex. App.—Dallas 2001, pet. denied).

[3]The trial began on May 17, 2024, and concluded on June 24, 2024.

[4]The parent–child relationship between Keaton and two alleged fathers had been terminated by interlocutory order.

purse. Another woman in the car also had a gun,[5] and Mother's boyfriend, David, had a "weed pen" with him.

Keaton had "quite a few" behavioral problems after coming into the Department's care; she had trouble in school, was kicked off the bus, and engaged in "hypersexual" behavior. According to a Department representative, Keaton had "been exposed to a lot beyond her age, so she kind of thought that was normal and was acting out on those things."

The Department's investigation revealed that Mother had a history with child-protection authorities in another state, but "all [the allegations had] been [ruled] unfounded . . . because . . . either [Mother was] uncooperative or they [could not] find her because she[ had] usually [been] transient." When she was a teenager, Mother had been investigated for trafficking, and at the time of trial, she had "been stopped" for trafficking "recently."[6] She had a history of abuse from family members and in romantic relationships.[7]

---

[5]Mother had met this woman on a social-media site and, according to Mother, had been her girlfriend "for . . . a few days" at that time. They broke up after Mother's arrest.

[6]When pressed for details about this stop, she pleaded the Fifth. She also pleaded the Fifth when asked about other criminal behavior, including the pre-removal stop and arrest for drug possession and a 2020 arrest for shooting into a crowd in an alleged gang-related drive-by shooting.

[7]For example, Mother admitted calling police when a man she had been in a short-term relationship with—when Keaton was around three years old—hit her; however, she denied that Keaton saw the abuse.

Mother had been "in a relationship" with David for a couple of years; she met him online and allowed him to move in with her and Keaton. Keaton called him "dad" even though he is not her biological father. The Department was concerned that David used "substances," had a gang affiliation and criminal history, and had engaged in domestic violence. Also, according to the Department's caseworker, David had taught Keaton "how to shoot a gun" at Mother.[8]

Although Mother contended that she had broken up with David by the time of trial,[9] evidence suggested the opposite. In March 2024, two months before the first day of trial, David was arrested in Tulsa for promoting prostitution; the arrest report for that offense listed Mother as one of the prostitutes who showed up to a hotel room when police answered David's Craigslist ad as part of a sting operation.[10] Mother pleaded the Fifth when asked about her involvement in the offense. Later that month, Mother was riding in a car with David when she was cited for not wearing a seatbelt and he was arrested for driving under the influence of drugs. Additionally, David had appeared in the background of some of Mother's Zoom visits with

---

[8]Mother denied that David was violent and that he had taught Keaton how to use a gun.

[9]Mother testified that she did not understand why she had to break up with David.

[10]Mother was arrested for prostitution later that month in a different city. She denied committing that offense and pleaded the Fifth when asked about it.

Keaton, and in June 2024 the caseworker saw David pick Mother up outside the courthouse.

Mother suffered from anxiety, depression, bipolar disorder, and PTSD, which she treated with marijuana.[11] Mother had used marijuana from the age of twelve to the time of trial, and she admitted that she was using cocaine when Keaton was removed. Mother denied that Keaton had used marijuana, but she admitted that she had caught Keaton "hitting [her] pen" at least once when Keaton was four and that Keaton had probably done so other times.[12] Mother contended that she usually kept her drugs in a "safe" but that she had forgotten to lock up the pen one time.

Mother testified that she worked as a home caregiver from Monday through Friday for eight hours a day.[13] She homeschooled Keaton using YouTube videos and "learning books and stuff." She intended to continue homeschooling Keaton if

---

[11]After Keaton's removal but before trial, Mother obtained a medical marijuana card.

[12]The Department caseworker testified that Keaton had smoked marijuana but did not give any details about that use. In its brief, the Department cites as supporting evidence that Keaton tested positive for marijuana near the time of removal, but no evidence admitted at trial supports this fact. Instead, this reference comes from the introductory clause of one of counsel's questions—"So even though she's been testing positive and the child tested positive at the beginning of this case for marijuana, she just provided the medical marijuana card, would you say, maybe three months ago?"—and, as such, is not evidence. *See Jaimes v. Fed. Nat'l Mortg. Ass'n*, No. 03-13-00290-CV, 2013 WL 7809741, at *5 (Tex. App.—Austin Dec. 4, 2013, no pet.) (mem. op.); *Pikul v. Kroger Co. Store No. 536*, No. 2-03-337-CV, 2005 WL 375180, at *2 (Tex. App.—Fort Worth Feb. 17, 2005, no pet.) (mem. op.).

[13]Mother told the caseworker that she also braided hair so that she could buy marijuana.

Keaton were returned to her possession. At the time of trial, Mother lived with her mother (Grandmother), who was not an appropriate placement for Keaton because of a prior history with child-protection agencies. Mother had been placed in foster care when she was thirteen because of Grandmother's health issues.

Mother testified that she had completed all the services on her plan.[14] She stated that she had learned about the cycle of abuse and whom she should or should not be dating. Her therapist for individual counseling purportedly gave her written exercises to help with her mental-health issues. During the case, Mother was smoking marijuana or taking edibles every day. She testified that in the past, she had tried medications to manage her mental health, but she stopped taking them because they made her feel "like a zombie."[15] Mother told her drug counselor that she did not see any negative consequences from her marijuana use but would give it up if required to regain possession of Keaton.

Despite the fact that Mother had a medical-marijuana card, the Department had these concerns about her marijuana use: "The amount that she's using, how often

---

[14]The Department conceded that Mother had engaged in most of her services, but the caseworker noted that Mother did not follow through with the recommendation to address her drug use through outpatient therapy.

[15]In contrast, Mother had told the evaluator during a mental-health examination that she wanted to get back on mental-health medications because they made her feel better.

she's using, and that [Keaton] has been exposed to using herself."[16] According to the case manager, "I don't think marijuana is appropriate whenever you expose your child to teach them how to use." She opined that if Mother did not stop using marijuana, Keaton would "never . . . have a sober caregiver" or live in a home without drugs.

After hearing all of the evidence, the trial court terminated Mother's parent–child relationship with Keaton.

## II. Best-Interest Analysis

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). *In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *4 (Tex. App.— Fort Worth Jan. 18, 2024, pet. denied) (mem. op.). Mother does not challenge the predicate-conduct grounds found by the trial court. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (O)–(P). Instead, in her sole issue, she challenges the legal and factual sufficiency of the evidence to support the best-interest finding, contending that the evidence showed "that she has done a good job at raising her

---

[16]Mother had no negative drug screens during the case. Additionally, Mother had been hair tested in August and November 2023. During that three-month period, the cocaine metabolite in Mother's hair went up instead of down.

7

daughter, and that she never allowed her to be harmed, neglected, or without a proper home to live in."

### A. Applicable Law and Standard of Review

In evaluating the evidence for legal sufficiency to support a best-interest finding, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved that termination is in the child's best interest. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant it with our own. *In re*

*H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence considering nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

9

• the programs available to assist these individuals to promote the child's best interest;

• the plans for the child by these individuals or by the agency seeking custody;

• the stability of the home or proposed placement;

• the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

• the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## B. Evidence Pertinent to *Holley* Factors

In our best-interest sufficiency analysis, we will recount the evidence relevant to each of the *Holley* factors, but we will combine them topically for ease of discussion.

10

**1. The emotional and physical danger to Keaton now and in the future; Mother's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and any excuse for the acts or omissions**

• The Department's caseworker testified that Mother had not shown an ability to provide Keaton a stable home, had not refrained from criminal activity, and had not addressed her drug use for Keaton's benefit. According to the caseworker, "[a]ny suggestion we give her, she argues back as to why she wants to continue to do what she wants to do." The caseworker did not think Mother had learned from the parenting classes and counseling she had attended; according to the caseworker, Mother "continue[d] to choose herself and her desires over [Keaton]"—"she [did] not put [Keaton] first in any situation."

• Mother's psychological testing showed evidence of a burgeoning relationship problem with Keaton that included "turmoil." In a parenting session, Mother said that she wanted to "[g]ive [Keaton] all the love that [she] never got."

• Mother tried to record visits with Keaton against the Department's rules; she also would try to make Keaton ask Department representatives for more time for visits. Mother refused to travel to north central Texas (where Keaton had been placed) for visits and became argumentative when asked to do so.

• Keaton acted out sexually while in foster care and was hypersexual; she told another child she had a vibrator at her "real home" and that it "makes you feel good."

• Mother was diagnosed as having a high probability of substance-use disorder. In her December 2023 drug assessment, she estimated that she spent $50–$100 per week on marijuana, but she was unemployed at that time. She had no desire to change her substance use.

• Mother had posted food stamps for sale on Facebook in the weeks before trial. In addition, she had been arrested twice in the months before trial, and the trial court was permitted to draw negative inferences from her invoking her Fifth Amendment right. *See In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at *11 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.).

**2. Keaton's desires and emotional and physical needs now and in the future**

• Mother loves Keaton, was happy when she was able to visit her, and was depressed when she thought about termination. According to the CASA supervisor's report to the court, Mother and Keaton "have a clear love for each other and enjoy seeing each other, period. However, [Keaton] ha[d] indicated she [was] very happy where she [was placed] and she would like to stay there."

• The CASA supervisor had observed Zoom visits between Mother and Keaton that "did not generally go very well" compared to the in-person visits. With in-person visits, Mother was engaged with Keaton, but Keaton had a hard time staying engaged with Mother. Mother occasionally would take a call; during one, the supervisor heard Mother ask Keaton if she wanted to talk to David. After visits, Keaton "would have more accidents [and] wet the bed at night. She, on occasion, had violent outbursts at school. There was one incident where [Mother] had gotten a little belligerent with the caseworkers during a Zoom visit and [Keaton] attack[ed] a child at school the next day."

• The caseworker had not observed a visitation between Keaton and Mother but still had concerns if Mother were to be named a possessory conservator: "[H]er relationship is . . . not sustainable long term. [Keaton] struggles whenever she goes back and forth. She doesn't do as well in school. . . . [T]here's just an ongoing list."

• Since being placed in foster care, Keaton's problem behaviors had decreased significantly, and her behavior had improved "astronomical[ly]."

**3. The Department's plans and their stability**

• Keaton had been living in the foster home for six months before trial. She had developed a strong familial bond with her adoption-motivated foster mother and was in therapy.

**4. The stability of the home; Mother's parental abilities; and Mother's plans**

• According to the caseworker, Mother had no plans for Keaton's future if she were to be returned to her. Mother told a mental-health evaluator that her only support system is Grandmother. At trial, Mother testified that she planned to continue homeschooling Keaton and that she wanted to enroll her in gymnastics.

• The CASA supervisor testified that Mother appeared to avoid her unannounced home visit. The caseworker had never been able to view the home unannounced. During an announced visit, she "was not allowed to go in the bedroom" because Mother said her aggressive dogs were inside. According to Mother, the caseworker refused to go into her bedroom. Mother had purportedly sold the dogs—that she was selling to make extra money—by the time of trial.

• Grandmother smoked marijuana but did not have a medical card. Mother had no plans to move out of Grandmother's home and did not understand why Keaton could not live there. Mother also did not understand why David could not live with them.

• Mother gave the Department three potential family placements for Keaton: one did not want to take Keaton, and two others did not want to participate in a home study until they moved to Oklahoma. They had not moved by the time of trial. Nevertheless, all the potential placements had been involved with child-protection authorities in other states.

• Mother testified in May 2024 that she had a full-time job in home health-care; her therapy notes indicate that she was hired around January 11, 2024. Before that, she was unemployed.

## C. Termination in Keaton's Best Interest

Mother argues on appeal that the evidence supporting the trial court's best-interest finding is both legally and factually insufficient for the following reasons:

• She completed all her services.

• Her January 2024 drug test was positive only for marijuana, for which she had a medical card.

• She loves her daughter and wants her back.

• Mother had been Keaton's sole caregiver, was financially able to care for her, and had never physically or emotionally harmed her.

• The Department "does not like" Mother's former boyfriend, but there is no evidence that he harmed Keaton.

13

• Mother has good parenting abilities and the caseworker never observed Mother and Keaton together to say otherwise; likewise, the caseworker could not say whether Mother's home was appropriate and safe.

• Although there was not much evidence regarding programs available to help Keaton's eventual caregiver or any party's future plans for Keaton, placements often fail.

• Any negative effects Keaton experienced when visiting with Mother arose because she had to travel a long distance to do so.

Although we do not completely agree with counsel's characterization of the evidence,[17] we acknowledge that not all the trial evidence favors the Department's position over Mother's. Nevertheless, considering the evidence pertinent to each of the *Holley* factors, we conclude that the evidence is legally and factually sufficient to support the trial court's best-interest finding.

The evidence showed that

• Mother failed to protect Keaton and provide her with a safe environment—and also failed to appreciate why doing so is important for a child. Mother continued to engage in criminal activity and associate with unsafe people, and she denied her role in allowing Keaton to have contact with those people.

• Although there is no evidence that Mother directly physically or emotionally harmed Keaton, Keaton's post-removal behavior, including engaging in age-inappropriate and hypersexual behavior—which improved dramatically after being placed outside Mother's care—is evidence that she was harmed while in Mother's care.

• Mother continued to deny that her drug use—even for medical purposes—affected Keaton and that her failure to protect Keaton—who had no medical reason to use marijuana—from the presence of marijuana in the home endangered Keaton.

---

[17]Notably, the trial court stated on the record that it had found "significant credibility issues" with Mother's testimony.

• Mother did not demonstrate any appreciable changes in her behavior or parenting outlook after completing most of her services. Although Mother was deeply attached to Keaton, that attachment was problematic in that she failed to appreciate her role as a parent—not to prioritize her own desires to the detriment of her daughter's needs.

Accordingly, we overrule Mother's sole issue. *See, e.g.*, *In re A.M.*, No. 02-24-00199-CV, 2024 WL 4157766, at *16 (Tex. App.—Fort Worth Sept. 12, 2024, no pet. h.) (mem. op.); *In re C.W.*, No. 02-23-00414-CV, 2024 WL 637264, at *9–10, *13 (Tex. App.—Fort Worth Feb. 15, 2024, pet. denied) (mem. op.); *In re M.J.*, No. 02-23-00026-CV, 2023 WL 3643673, at *12 (Tex. App.—Fort Worth May 25, 2023, no pet.) (mem. op.); *In re A.B.*, 412 S.W.3d 588, 595, 605, 607 (Tex. App.—Fort Worth 2013) (per curiam) (op. on reh'g), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

## III. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: October 31, 2024