# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00501-CV

**Ken Paxton, Texas Attorney General, Appellant**

v.

**City of Austin, Mayor Steve Adler, Ora Houston, Delia Garza, Sabino Renteria, Gregorio Casar, Ann Kitchen, Don Zimmerman, Leslie Pool, Ellen Troxclair, Kathie Tovo, and Sheri Gallo, each in their Official Capacity, Appellees**

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-16-003340, THE HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In this appeal, the Attorney General challenges the district court's final judgment following a bench trial that imposed a $9,000 civil penalty on the City of Austin for violating a statutory provision regarding notices prohibiting licensed holders from carrying handguns on governmental premises. The Attorney General requests that we reverse and render judgment imposing $5,761,000—or alternatively $51,000—in civil penalties on the City.[1] For the following reasons, we affirm the district court's judgment.

## RELEVANT LAW

To provide context, we begin with the relevant statutory law. In 2015, the Legislature enacted Section 411.209 ("Wrongful Exclusion of Concealed Handgun License Holder") of the Texas Government Code—although amended in 2017 and 2019, only the 2015

---

[1] The City does not challenge the $9,000 civil penalty on appeal.

version is at issue here ("former Section 411.209"). *See* Act of May 23, 2015, 84th Leg., R.S., ch. 593, § 1, 2015 Tex. Gen. Laws 2000, 2000–01 (amended 2017, 2019) (current version at Tex. Gov't Code § 411.209). As noted in the bill analysis, the Legislature sought to address concerns "that some governmental entities erroneously post in places where it is legal to carry a concealed handgun certain signs stating that entry on the property with a concealed handgun is forbidden," "that the confusion arising from these types of mistaken postings may result in a concealed handgun license holder being wrongfully penalized for lawful actions," and "that the law should be clarified to eliminate any confusion regarding where it is legal to carry a concealed handgun." House Comm. on Homeland Sec. & Pub. Safety, Bill Analysis, Tex. S.B. 273, 84th Leg., R.S. (2015). Former Section 411.209(a) provides:

> A state agency or a political subdivision of the state may not provide notice by a communication described by Section 30.06, Penal Code, or by any sign expressly referring to that law or to a concealed handgun license, that a license holder carrying a handgun under the authority of this subchapter is prohibited from entering or remaining on a premises or other place owned or leased by the governmental entity unless license holders are prohibited from carrying a handgun on the premises or other place by Section 46.03 or 46.035, Penal Code.

Former Tex. Gov't Code § 411.209(a). As an enforcement mechanism, former Section 411.209 imposes civil penalties on a state agency or political subdivision of no less than $1,000 for the first violation and $10,000 for a subsequent violation, with "[e]ach day of a continuing violation of Subsection (a) constitut[ing] a separate violation." *Id.* § 411.209(b)–(c), (g).

Importantly for this appeal, former Section 411.209(a) references three provisions from the Texas Penal Code that address when a handgun license holder has received notice and where handguns are prohibited for criminal offenses. *See* Tex. Penal Code §§ 30.06 ("Trespass by License Holder with a Concealed Handgun"), 46.03 ("Places Weapons Prohibited"), 46.035

2

("Unlawful Carrying of Handgun by License Holder").[2]  Section 30.06 provides, "For purposes of this section, a person receives notice if the owner of the property or someone with apparent authority to act for the owner provides notice to the person by oral or written communication." *Id.* § 30.06(b).  Although "oral . . . communication" is undefined, Section 30.06 defines "written communication," as relevant here, to mean:

> (A)   a card or other document on which is written language identical to the following:  "Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun"; or
>
> (B)   A sign posted on the property that:  (i) includes the language described by Paragraph (A) in both English and Spanish . . . .

*Id.* § 30.06(c)(3)(A)–(B).  Section 46.03 prohibits a person from carrying a handgun "on the premises of any government court or offices utilized by the court, unless pursuant to written regulations or written authorization of the court," and provides that "[p]remises" has the meaning "assigned by Section 46.035," *id.* § 46.03(a)(3), (c)(2), which defines "[p]remises" to mean "a building or a portion of a building," *id.* § 46.035(f)(3).

## BACKGROUND

For purposes of this appeal, the relevant facts introduced at trial are largely undisputed.  The Attorney General called as witnesses Michael Cargill, a local business owner of a gun store; David Lothery, the security manager for the City's building services department; Eric Stockton, a building services officer for the City; and Captain Gregory Lucas with the Attorney General's office.  The City did not call any witnesses.

---

[2]   We cite to the current versions of these sections as they have not substantively changed—as relevant to this appeal—since the Legislature enacted former Section 411.209.

3

As relevant here, Cargill testified to the following facts. On September 1, 2015—former Section 411.209's effective date—Cargill sent a letter to the City requesting that the City remove the signs outside of City Hall that had Section 30.06's specified language prohibiting handguns or he would file a complaint with the Attorney General. The City removed those signs, and after September 1, Cargill did not see at City Hall a sign with Section 30.06's specified language. He returned to City Hall in 2016—on April 4, 6, and 12—and during one of those visits, he took the following picture of the front doors of City Hall, showing a glass etching of an interdictory circle with a handgun:



Exhibit 9
Page 1 of 1

During those April visits, Cargill stated to the security guard that he would like to enter and that he was a license holder carrying a concealed handgun. The security guard responded that the City had a policy that a license holder carrying a handgun could not enter City Hall because handguns were prohibited and there was a community court on the premises.

4

Lothery testified regarding the City's policy for weapons in City Hall and described an internal memorandum that was admitted into evidence. The memorandum specifies that the statement "WEAPONS ARE NOT ALLOWED IN CITY HALL, BECAUSE IT IS DESIGNATED AS A COURT FACILITY" is to be used for anyone who challenges the policy and instructs to "REPEAT IF NECESSARY, DO NOT ADD OR OMIT ANY VERBIAGE FROM THE STATEMENT ABOVE." Lothery explained that "our procedure is we want [the security guards] to answer specifically those words if anyone questions or asks about weapons in City Hall" and "we use that same speech every time we're open, 24/7. Same verbiage."

Cargill testified that following his visits, Cargill sent the City letters asserting that "the security guards are continuing to communicate verbal effective notice under Penal Code § 30.06" and that the exception for premises of a government court is not applicable because the community court operates only at limited times at City Hall. On April 6, Cargill sent a letter to Captain Lucas with the Attorney General's office complaining that the security guards at City Hall "are continuing to communicate verbal effective notice under Penal Code § 30.06."

Captain Lucas testified that after receiving Cargill's complaint, he went to City Hall "on four separate occasions" in 2016—July 1 and 29, August 12, and September 7. On approaching City Hall, he saw the etching on the front door "that had the gun with the universal line through it" and was told he could not go in if he had a handgun, even if he was a licensed holder. After the visits, he emailed his colleagues that "there were no [Section] 30.06 signs." But based on his investigation and given the verbal communications from the security guards, he found Cargill's complaint "credible" and forwarded it to the office's civil attorneys.

In July, the Attorney General sued the City for violating former Section 411.209, alleging two types of violations—(1) "the display of a permanent etched glass 'no guns' sign"

5

that "depicts a handgun inside of a circle with a line through it," and (2) "oral warnings prohibiting the carrying of handguns on the premises of Austin City Hall"—and requesting "civil penalties in the amount of $1,500 per day of violation commencing on July 25, 2016, running through judgment" and attorney's fees. The City filed a plea to the jurisdiction to dismiss the claims, which the district court, in a December 2017 order, granted in part "as to [the Attorney General's] claim that the etched glass symbol of a gun with circle around it and a line through it is a violation of [former] Section 411.209." Following a January 2019 bench trial on the alleged violation based on the "oral warnings," the district court signed its final judgment in August 2019, finding that the Attorney General met his burden to establish a violation of former Section 411.209(a) on six days in 2016—April 4, 6, and 12; July 1 and 29; and September 7—but "failed to establish a violation on any other date" and ordering that the City pay "$1,500 for each of the six violations found, for a total of $9,000 in civil penalties," and attorney's fees.

The City did not appeal and therefore neither challenges the ruling that it violated former Section 411.209(a) with oral warnings on six days nor contests the judgment imposing $9,000 in civil penalties. The Attorney General appeals, requesting that this Court reverse the district court's order granting the City's plea to the jurisdiction on the etching claim, reverse the $9,000 judgment against the City on the oral warning claim, and render judgment imposing $5,761,000—or alternatively $51,000—in civil penalties based on the City's "continuing violation" and the mandatory minimum penalty amount of $10,000 for subsequent violations.

## DISCUSSION

On appeal, the Attorney General presents five issues: (1) the district court erred in granting the City's plea and dismissing the Attorney General's claim that the City violated former Section 411.209(a) by "posting a sign that depicts a gun inside an interdictory circle";

6

(2) the district court erred by not imposing cumulative penalties for a "continuing violation" when the Attorney General introduced uncontroverted evidence showing a pattern of violation; (3) the City should not be permitted to prohibit handguns from an entire building where only a portion of that building is being used as a court; (4) the district court erred by imposing a penalty that is less than former Section 411.209(b)(2)'s mandatory minimum of $10,000 for subsequent violations; and (5) the district court should reassess the award of attorney's fees given the points of error identified in the Attorney General's first four issues presented.

**Plea to the Jurisdiction on the Etching Claim**

In his first issue, the Attorney General asserts that former Section 411.209(a) prohibits the etching of an interdictory circle containing a handgun (the City's Etching) and that the district court erred in "conclud[ing] that the Attorney General could not establish liability for the interdictory circle, and therefore the City's immunity from suit was not waived as to that claim." The City's plea to the jurisdiction asserts that it was "challeng[ing] the AG's ability to establish a prima facie case." On appeal, the Attorney General challenges whether the City's Etching could constitute a violation of former Section 411.209(a), and we consider whether he met his appellate burden to demonstrate that the district court erred on this issue.

When the facts at issue are undisputed and the plea turns on the meaning of a statute, we review the statutory construction de novo to ascertain and give effect to the Legislature's intent. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) ("The meaning of a statute is a legal question, which we review *de novo* to ascertain and give effect to the Legislature's intent."); *University of Tex. v. Poindexter*, 306 S.W.3d 798, 806 (Tex. App.—Austin 2009, no pet.) ("If, however, the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those

7

undisputed facts."). "We seek that intent 'first and foremost' in the statutory text, and '[w]here text is clear, text is determinative' of intent." *Colorado County v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (quoting *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015); *Entergy Gulf States*, 282 S.W.3d at 437).

To be a prohibited notice under former Section 411.209(a), the notice must be either "by a communication described by Section 30.06, Penal Code" or "by any sign expressly referring to that law or to a license to carry a handgun." Former Tex. Gov't Code § 411.209(a). The Attorney General argues that the City's Etching meets both requirements. We disagree.

First, the City's Etching is not "a communication described by Section 30.06, Penal Code." *See id.* Section 30.06 describes only two types of communications: oral and written. *See* Tex. Penal Code § 30.06(b) ("For purposes of this section, a person receives notice if the owner of the property or someone with apparent authority to act for the owner provides notice to the person *by oral or written communication*." (emphasis added)). The City's Etching is not an "oral communication," which is undefined in the statute but generally refers to "[s]poken or uttered" communications. *Oral, Black's Law Dictionary* (11th ed. 2019) ("Spoken or uttered; not expressed in writing."); *see Colorado County*, 510 S.W.3d at 448 (consulting dictionary definitions to determine ordinary and common meaning of undefined word in statute). And although the City's Etching perhaps could be considered a "written communication" in the ordinary and common meaning of that phrase, Section 30.06 expressly defines "written communication." *See* Tex. Gov't Code § 311.011(b) ("Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."); *Entergy Gulf States*, 282 S.W.3d at 437 ("We do not look to the ordinary, or commonly understood, meaning of the term because the Legislature has supplied its own

8

definition, which we are bound to follow."). The provision defines "written communication" to mean either "a card or other document on which is written language identical" to the language specified in Paragraph (A)—"Pursuant to Section 30.06, Penal Code (trespass by license holder with a concealed handgun), a person licensed under Subchapter H, Chapter 411, Government Code (handgun licensing law), may not enter this property with a concealed handgun."—or a sign that "includes the language described by Paragraph (A) in both English and Spanish." Tex. Penal Code § 30.06(c)(3)(A), (B)(i). It is undisputed that the City's Etching is not a card or document that has on it the specified written language and that it does not "include[]" the specified language in either English or Spanish.[3]

The Attorney General argues that requiring former Section 411.209(a) to apply to only communications described by Section 30.06 could produce an absurd reading—e.g., "a municipality may avoid liability by adding a single word" or "by altering one punctuation mark" to Section 30.06(c)(3)(A)'s required language. But if the sign's language were missing a single word or altered a punctuation mark, the second prong in former Section 411.209(a) likely would cover the sign as it would "expressly refer[] . . . to that law [Section 30.06] or to a license to carry a handgun." Former Tex. Gov't Code § 411.209(a). Regardless, this is not that case: the City's Etching does not include any of Section 30.06(c)(3)(A)'s specified language, let alone

---

[3] The Attorney General asserts that "[v]iewed as a coherent whole, § 30.06 is concerned with 'oral or written' communications providing notice that entry onto property with a handgun is forbidden" and that "[a] depiction of an interdictory circle containing a handgun undoubtedly communicates that entry with a handgun is forbidden." That may be so, but it does not mean that the City's Etching is a prohibited "communication described by Section 30.06" of the Texas Penal Code. *See* former Tex. Gov't Code § 411.209(a). The Attorney General argues that because "[t]he statute refers to a communication 'described by § 30.06" and "does not refer . . . to a communication 'described by § 30.06**(c)(3)**,'" former Section 411.209(a) does not incorporate Section 30.06(c)(3)'s definition of "written communication." But the statutory definition of "written communication" expressly applies "[i]n this section," and the Attorney General's argument is therefore unavailing. *See* Tex. Penal Code § 30.06(c).

"add[] a single word" or "alter[] one punctuation mark." *See Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 630 (Tex. 2013) ("[T]he bar for reworking the words our Legislature passed into law is high, and should be. The absurdity safety valve is reserved for truly exceptional cases[.]"). Moreover, to apply the absurdity doctrine as the Attorney General requests when the law is otherwise clear and unambiguous would require this Court to "devolve[] into purposive interpretation of statutes," which "always tempts but rarely tempers." *Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 574 (Tex. 2014) (Willett, J., concurring). Here, a rational Legislature could have intended to limit former Section 411.209(a)'s prohibition to the type of notice required under Section 30.06 to impose criminal liability, *see Combs*, 401 S.W.3d at 630–31 ("The absurdity backstop requires more than a curious loophole" and "pointing out a quirky application is quite different from proving it was quite impossible that a rational Legislature could have intended it."), and a "court must be careful not to substitute its own view of what should have been intended for what *was* intended," *Jaster*, 438 S.W.3d at 571 (plurality op.) (quoting *Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 321 (Tex. 2000) (Hecht, J., concurring)).

Second, the City's Etching is not a "sign expressly referring to that law [Section 30.06] or to a license to carry a handgun." *See* former Tex. Gov't Code § 411.209(a). The Attorney General argues that the statute covers any sign referring to "a license holder's ability to enter with a handgun." But the statute addresses only signs expressly referring to "that law" or "a license," not the "ability to enter with a handgun." And the City's Etching does not refer to "that law"—Section 30.06—or to "a license" at all, let alone "in direct or unmistakable terms."[4]

---

[4] The Legislature amended Section 411.209(a) to its current version to express its intent to expand former Section 411.209(a)'s coverage by prohibiting "*any* action, *including* an action consisting of the provision of notice by a communication described by Section 30.06 or 30.07,

10

"Ordinarily, the truest manifestation of what legislators intended is what lawmakers enacted, the literal text they voted on." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). Former Section 411.209(a)'s "enacted language is what constitutes the law," and "when a statute's words are unambiguous and yield a single inescapable interpretation, the judge's inquiry is at an end." *See id.* at 651–52. Because the City's Etching is neither "a communication described by Section 30.06, Penal Code" nor a "sign expressly referring to that law or to a license to carry a handgun," *see* former Tex. Gov't Code § 411.209(a), the Attorney General has not satisfied his appellate burden to demonstrate that the district court erred in dismissing his "claim that the etched glass symbol of a gun with circle around it and a line through it is a violation of [former] Section 411.209." Accordingly, we overrule the Attorney General's first issue.

**Continuing Violation**

In his second issue, the Attorney General challenges the district court's conclusion that the City did not commit a continuing violation. *See* former Tex. Gov't Code § 411.209(c) ("Each day of a continuing violation of Subsection (a) constitutes a separate violation."). The district court concluded that the Attorney General met his burden to establish a violation of former Section 411.209(a) for six different days in 2016—April 4, 6, and 12; July 1 and 29; and September 7—but that the Attorney General "failed to establish a violation on any

---

Penal Code, that states or *implies* that a license holder who is carrying a handgun under the authority of this subchapter is prohibited from entering or remaining on a premises or other place owned or leased by the governmental entity." Tex. Gov't Code § 411.209(a) (emphases added). However, "[w]e are constrained to construe the statute as it existed"; it is our responsibility to apply the applicable law as written, not as it would later be written absent the Legislature making the law retroactively applicable. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 44 (Tex. 2020) (quoting *In re C.O.S.*, 988 S.W.2d 760, 764 (Tex. 1999)); *see Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 638 (Tex. 2010) (noting courts "are responsible for a true and fair interpretation of the law as it is written").

11

other date." Because we have overruled the Attorney General's first issue, we consider only the "oral warnings" but not the City's Etching as evidence of a continuing violation.

When, as here, "neither party requests findings of fact and conclusions of law following a nonjury trial" and "a reporter's record is filed on appeal," then "all fact findings necessary to support the trial court's judgment are implied" but "may be challenged on factual- and legal-insufficiency grounds." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). To the extent that the Attorney General is challenging the sufficiency of the evidence, we conclude that the Attorney General is raising a legal but not factual sufficiency challenge.[5] "When a party attacks the legal sufficiency of an adverse finding on an issue on which it bears the burden of proof, the judgment must be sustained unless the record conclusively establishes all vital facts in support of the issue." *Id.* To the extent that the Attorney General is relying on undisputed facts or is challenging legal questions related to the burden of proof, we review those de novo. *See Reliance Nat'l Indem. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007) ("Appellate courts review legal determinations de novo, whereas factual determinations receive

_____

[5] On appeal, the Attorney General requests that we render judgment imposing additional civil penalties; he also requests a remand but only for the limited purpose of recalculating an attorney's fee award following vacatur. "Generally, a party is not entitled to relief it does not request." *Texas Parks & Wildlife Dep't v. Sawyer Tr.*, 354 S.W.3d 384, 392 (Tex. 2011) (citing *State v. Brown*, 262 S.W.3d 365, 370 (Tex. 2008)). Because the Attorney General, on this issue, does not request a remand—the relief generally provided for a factual sufficiency challenge—we construe his challenge as a legal sufficiency challenge. *See Glover v. Texas Gen. Indem.*, 619 S.W.2d 400, 401–02 (Tex. 1981) (per curiam) ("If the court of civil appeals sustains the point finding the evidence factually insufficient, it must reverse the judgment of the trial court and remand for new trial."); *Airway Ins. v. Hank's Flite Ctr., Inc.*, 534 S.W.2d 878, 882 (Tex. 1976) ("A remand is the relief usually sought by a party who complains of 'factual insufficiency.' A prayer for rendition, with a proper procedural basis therefor, usually indicates that the complaint relates to 'no evidence' or 'established as a matter of law' points."); *City of Univ. Park v. Van Doren*, 65 S.W.3d 240, 246 (Tex. App.—Dallas 2001, pet. denied) ("Although the wording of this issue makes it appear the City is asserting factual insufficiency of the evidence, the City's argument under this issue asserts only the legal insufficiency of the evidence. . . . The City's prayer requests rendition in its favor but does not request a new trial.").

more deferential review based on the sufficiency of the evidence. What might otherwise be a question of fact becomes one of law when the fact is not in dispute or is conclusively established.").

The Attorney General challenges the district court's judgment by claiming that "uncontroverted evidence shows a pattern of violations over a three-year period pursuant to an ongoing policy"; that "where a plaintiff has introduced evidence of a continuing course of violative acts that have not abated, Texas courts presume a continuing violation absent evidence to the contrary"; that the "government discharges its duty of proving a continuing violation by presenting evidence of a continuing course of conduct" and the "burden then shifts to the defendant to demonstrate compliance"; that the City therefore "violated the statute 577 different times" during the period "from July 25, 2016, through January 4, 2019"; and that we should "reverse and render judgment imposing civil penalties not less than $5,761,000." Thus, to succeed on his argument given our standard of review, the Attorney General must show that the record conclusively proves all vital facts necessary to establish as a matter of law a presumption of a continuing violation, that the presumption "discharges" the Attorney General's burden and shifts the burden to the City "to demonstrate compliance," and that the City did not present legally sufficient evidence in response.[6]

The Attorney General argues that he "supplied uncontroverted evidence of a continuing violation in the form of . . . repeated oral pronouncements by security officers pursuant to a script from which they could not deviate." After reviewing the record, the relevant evidence to the issue of a continuing violation is the following. First, the City has a policy

---

[6] We assume without deciding that the Attorney General is correct that a presumption generally can discharge the Attorney General's burden to establish a continuing violation in the context of a former Section 411.209 violation.

13

stating "WEAPONS ARE NOT ALLOWED IN CITY HALL, BECAUSE IT IS DESIGNATED AS A COURT FACILITY" for security personnel to communicate to someone who challenges the City's weapons policy. Second, Lothery testified that "if anyone questions or asks about weapons in City Hall," it is the City's procedure to have security officers use "specifically those words" in the script in response and "we use that same speech every time we're open, 24/7. Same verbiage." Third, Cargill testified that on three instances in April 2016 the security guard told him that he could not carry a handgun inside the building despite having a license. Fourth, Captain Lucas testified that he visited City Hall on multiple occasions and that he was told by the security guard that he could not enter the building with a handgun even if he were a licensee. These facts are undisputed on appeal, and thus the issue is whether these facts conclusively established as a matter of law a presumption of a continuing violation from 2016 through 2019.

As an initial matter, we note that the statute prescribing that "[e]ach day of a continuing violation of Subsection (a) constitutes a separate violation," former Tex. Gov't Code § 411.209(c), does not expressly speak to either a presumption or the necessary proof to establish a "continuing violation." Rather, the statute differentiates a "continuing violation"—that perhaps otherwise could be considered a single violation—into separate violations for each day for imposing civil penalties under subsection (b). For example, if a state agency posted a sign for three months such that it was "provid[ing] notice" prohibited by former Section 411.209(a), Subsection (c) provides that the act of posting the sign is not the sole and single violation; instead, each day the sign was posted "provid[ing] notice" constituted a separate violation. *Id.*

Here, in contrast, the six established violations were discrete and differentiated acts triggered by either Cargill or Captain Lucas asking whether a license holder could enter City Hall with a handgun. Moreover, the City's policy expressly stated that the scripted statement

14

was "TO BE USED FOR ANYONE WHO CHALLENGES OUR WEAPONS POLICY" and Lothery testified that the scripted statement was to be used "if anyone questions or asks about weapons in City Hall." Accordingly, the Attorney General's evidence of the City's policy did not conclusively establish a continuing violation of "provid[ing] notice" prohibited by former Section 411.209(a) because the policy required a triggering event before notice would be provided.

Nevertheless, the Attorney General cites two cases from the Texas Supreme Court to argue that he discharged his burden to present evidence of a violation on the other 571 of the 577 days because he conclusively established a presumption of a continuing violation based on the oral statements of the security guards on six days. *See State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 802 (Tex. 1979) (considering whether "there is no evidence to support the jury's finding that the sixth cooker . . . had been operated for more than three days during the entire period of 478 days"); *State v. Harrington*, 407 S.W.2d 467, 478–79 (Tex. 1966) (considering whether "allegations and proof that [defendants] maintained the well in an unplugged state for a period of over 3,650 days amounts to no evidence that the well was 'operated' for that period of time").[7] But these cases do not support the Attorney General's position.

In *Harrington*, the trial court "held as a matter of law that the well . . . was operated in violation of law during a period of 3650 days." 407 S.W.2d at 469. On appeal, our

---

[7] The Attorney General also cites two cases from this Court to support his proposition that "where a plaintiff has introduced evidence of a continuing course of violative acts that have not abated, Texas courts *presume* a continuing violation absent evidence to the contrary." *See Slay v. Texas Comm'n on Envt'l Quality*, 351 S.W.3d 532, 541 (Tex. App.—Austin 2011, pet. denied); *Jonnet v. State*, 877 S.W.2d 520, 522–24 (Tex. App.—Austin 1994, writ denied). But the question at issue here is what constitutes "evidence of a continuing course of violative acts." And *Slay* and *Jonnet* do not provide support that the evidence here is "evidence of a continuing course of violative acts"; as admitted by the Attorney General, these cases "do[] not discuss what kind of evidence sufficed" to support a continuing violation. Moreover, *Slay* and *Jonnet* concerned whether evidence existed to *support* the administrative and district court findings, not to overcome adverse implied findings.

15

Court reversed on this issue. *Harrington v. State*, 385 S.W.2d 411, 423 (Tex. App.—Austin 1964), *rev'd*, 407 S.W.2d 467 (Tex. 1966). We noted that "[i]t is undisputed that the well in suit was operated and produced oil monthly for the ten year period on which the assessed penalties were based," that "[a] plugged well cannot operate" or "produce oil," and that the evidence showed "that the well produced its monthly allowable commencing with May, 1952, to and including June, 1962." *Id.* at 421. We then considered the State's two arguments on appeal: (1) "since the evidence shows that the well was in an operative condition that this is the equivalent of a showing that it was continuously operated by the production of oil," and (2) "having shown that the well was completed as a producer, the presumption should be indulged that production was continuous thereafter until otherwise shown." *Id.* at 422. We rejected the State's arguments, concluding that the evidence "establishes only the possibility that the well produced oil each of the 3,650 days for which penalties were assessed" and noting that the invoked presumption should not be available to the State because "[p]enalty suits are analogous to criminal proceedings and the State, in our opinion, should shoulder the burden of establishing its case unaided by presumptions applicable in ordinary civil actions." *Id.* at 422–23. The Texas Supreme Court reversed this Court and affirmed the trial court, concluding that "[t]he words 'operated' and 'produced' are not synonymous," that "[t]he word 'operated' . . . means everything that is done to maintain an oil well so as not to abandon it," and that "[t]he evidence shows that the well produced its allowable during a period of more than 3,650 days" and "was maintained and operated so that it could produce oil at a moment's notice." *Harrington*, 407 S.W.2d at 479. In its opinion, the Texas Supreme Court did not "reject" this Court's approach to not apply the State's invoked presumption, as the Attorney General argues; rather, the Texas Supreme Court distinguished between the terms "operated" and "produced" and

16

concluded that there exists evidence given this distinction to "discharge[] [the State's] burden" of proving that the well was being "operated" for the time period at issue. *Id.* at 473, 479. Accordingly, *Harrington* does not support the Attorney General's position that he conclusively established a presumption of a continuing violation here.

In *Texas Pet Foods*, the Texas Supreme Court considered whether the evidence supported the jury's finding that a "sixth cooker" operated without an operating permit over 478 days. 591 S.W.2d at 805. Texas Pet Foods argued that the evidence supported only three separate days, but the Texas Supreme Court, relying on *Harrington*, held that the evidence demonstrated that the sixth cooker "was capable of operating and producing even when it was not actually doing so" and that "the jury was entitled to find that the sixth cooker was being 'operated' on a daily basis for six days a week even when it was not actually producing a product by means of a cooking cycle." *Id.* Thus, *Texas Pet Foods* provides no more support than *Harrington* of a presumption of continuing violation.[8]

Neither *Harrington* nor *Texas Pet Foods* supports the Attorney General's argument that his evidence conclusively established a presumption of a continuing violation. Moreover, the Texas Supreme Court in both *Harrington* and *Texas Pet Foods* reviewed the evidence in light of favorable findings, not adverse implied findings as here. Given our standard of review and the adverse implied findings supporting the district court's judgment, we cannot conclude that the Attorney General's evidence conclusively established a presumption of a

---

[8] The Texas Supreme Court also considered whether "the existence of a present or threatened violation . . . will support the issuance of a permanent injunction" and noted, "When the jury finds violations occurring and continuing up to or near the date of the trial, the trial court may, in equity, determine that the defendant has engaged in a settled course of conduct and may assume that it will continue, absent clear proof to the contrary." *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 802, 804 (Tex. 1979). Here, however, there was no jury finding or trial court determination that a violation would continue, such that appellate deference might be warranted. Accordingly, *Texas Pet Foods* does not support the Attorney General's position.

17

continuing violation that discharged his burden from producing evidence of a violation on 571 of the 577 days for which he seeks relief. We overrule the Attorney General's second issue.

**Premises**

In his third issue, the Attorney General argues that the district court "misunderstood *where* the City may lawfully prohibit handguns" by interpreting "premises"— defined as "a building or a portion of a building," *see* Tex. Penal Code §§ 46.03(c)(2), .035(f)(3)—in the phrase "on the premises of any government court or offices utilized by the court," *id.* § 46.03(a)(3), to mean "an entire building—regardless of whether the whole building or only a portion of it is being used as a government court." Thus, according to the Attorney General, "if the trial court had properly concluded that a municipality may ban guns only from that portion of the building being used as a court, the City could not provide a blanket ban— written or oral—at the building's entrance."

Because we have overruled the Attorney General's first two issues, however, we need not resolve this issue. The only violations of former Section 411.209(a) at issue now are those that the district court concluded occurred on six different days and the district court found that the City "failed to establish an exception to [former] Section 411.209(a)" for any of those six days, which the City does not challenge on appeal. Accordingly, the proper interpretation of "premises" is not relevant to these violations, and we overrule the Attorney General's third issue.

**Amount of Penalty**

In his fourth issue, the Attorney General asserts that the district court erred in awarding $1,500 for each violation when the statute requires $10,000 as a mandatory minimum for each subsequent violation. *See* former Tex. Gov't Code § 411.209(b)(2) (imposing liability

18

for civil penalty of "not less than $10,000 . . . for the second or a subsequent violation"). However, in his live petition, the Attorney General specifically requested an award of $1,500 for each violation; at trial, the Attorney General represented that he is "request[ing] civil penalties of $1500 per day running from July 25th, 2016, through the judgment"; and in its final judgment, the district court ordered the City to "pay $1,500 for each of the six violations found, for a total of $9,000 in civil penalties."

Our rules require that "[a]s a prerequisite to presenting a complaint for appellate review," the record must show that "the complaint was made to the trial court by a timely request" and that the trial court ruled or refused to rule on the request. Tex. R. App. P. 33.1(a); *see Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015) ("'Parties are restricted on appeal to the theory on which the case was tried.' Appellate courts are similarly restricted and may not overlook the parties' trial theories." (quoting *Davis v. Campbell*, 572 S.W.2d 660, 662 (Tex. 1978))); *G.T. Leach Builders, LLC v. Sapphire V.P.*, 458 S.W.3d 502, 516 (Tex. 2015) (noting "well-established error-preservation rules" that "preclude a party from seeking appellate review of an issue that the party did not properly raise in the trial court"). "Important prudential considerations underscore our rules on preservation." *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003); *see Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 479 (Tex. 2019) ("[O]ur law on preservation is built almost entirely around putting the trial court on notice so that it can cure any error."). For example:

> This rule "conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds," promotes "fairness among litigants" by prohibiting them from surprising their opponents on appeal, and furthers "the goal of accuracy in judicial decision-making" by allowing the parties to "develop and refine their arguments" and allowing the trial court to "analyze the questions at issue."

19

*USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 510 (Tex. 2018) (quoting *In re B.L.D.*, 113 S.W.3d at 350)). Thus, "we will not consider an error that was not properly raised in the trial court 'unless a recognized exception exists.'" *Id.* (quoting *In re B.L.D.*, 113 S.W.3d at 350).

Here, the Attorney General did not raise any complaint until his appeal regarding the district court's award of a $1,500 per diem amount rather than the mandatory $10,000 minimum authorized by the statute for subsequent violations.[9] And the Attorney General has not cited—nor have we found—a recognized exception for this point of error.[10] *See, e.g.*, *In re B.L.D.*, 113 S.W.3d at 350 (recognizing "limited exception" of "fundamental-error doctrine" related to jurisdictional error and in "quasi-criminal" juvenile delinquency cases). We therefore overrule the Attorney General's fourth issue. *See* Tex. R. App. P. 33.1(a).

**Attorney's Fees**

Because we have overruled the Attorney General's first four issues presented, we also overrule his fifth issue requesting a reassessment of attorney's fees, which is predicated on sustaining the other issues presented.

---

[9] The Attorney General argues that he sent a July 5, 2016 letter to the City stating that Section 411.209(b) "authorizes the court to assess civil penalties in the amount of . . . [n]ot less than $10,000 . . . for the second or a subsequent violation" and that he attached this letter to his live petition and his response to the City's plea to the jurisdiction. But attaching as an exhibit a letter to the City that mentioned the minimum penalty amount authorized by statute does not constitute a "complaint" that "was made to the trial court by a timely request, objection, or motion." *See* Tex. R. App. P. 33.1(a)(1). Nor has the Attorney General shown how the district court either "ruled" or "refused to rule" on "the request, objection, or motion" when the Attorney General only mentioned the statutory minimum penalty amount in an exhibit. *See id.* R. 33.1(a)(2).

[10] The Attorney General cites our sister court's decision in *Spiller v. Spiller*, 901 S.W.2d 553, 559 (Tex. App.—San Antonio 1995, writ denied) (holding that parties' stipulation that statute at issue required compound interest did not bind trial court because parties "may not stipulate as to the applicable law"), and asserts that if we do not apply the minimum penalty, we will "create a split of authority and invite Supreme Court review." But in *Spiller*, a "motion for new trial adequately preserved the issue on appeal." *Id.*

20

**CONCLUSION**

Having overruled the Attorney General's issues presented, we affirm the district court's final judgment.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed:   July 22, 2021